# THE SUPREME COURT

OF THE

# STATE OF ILLINOIS,

OF CASES ARGUED AT

## NOVEMBER TERM, 1862, AT MOUNT VERNON.

---

The People of the State of Illinois *ex rel.* Melville W. Fuller, Complainants, *v.* L. P. Hilliard *et al.*, Respondents.

| 29 | $\overline{413}$ |
|----|----|
| 63a | 622 |
| 29 | 413 |
| 193 | 1591 |
| 29 | 413 |
| 102a | 5279 |
| 29 | 413 |
| 103a | 4 69 |

### APPLICATION FOR MANDAMUS.

In proceedings by mandamus, it is not indispensable that the petition should state that the relator is without any other adequate and sufficient remedy. If that appears to the court to be the fact, the alternative writ will not be quashed.

The House of Representatives, in a State Legislature, have no such jurisdiction over the counting of the votes for members as will oust the jurisdiction of the common law courts in proceedings by mandamus against the canvassers. The member elected has a right to receive the certificate of election, and if it is refused him, and given to another, he may call upon the courts for redress, by mandamus.

Its sole purpose is to procure the requisite evidence to present to the House, of a *prima facie* right to a seat in it, independent wholly of the question of qualification. And the only means by which this can be obtained is by the compulsory writ of mandamus.

This is not the case where one person desires to be placed in an office now filled by another, for in such cases mandamus will not lie. It is more analogous to a demand for the books and papers belonging to an office, or for the insignia of office, for which this is the proper remedy.

People *ex rel.* Fuller *v.* Hilliard *et al.*

The office of canvassers is merely ministerial, and as such will be controlled by the court under this process. They are required by statute to count all the votes formally certified to them. And the fact that some of the judges of election do not appear to have been properly sworn, is no objection to the validity of their returns. The certificate of an officer *de facto* is all that is required.

And if any informality had really occurred, it might have been corrected before the canvassers, and should not have been allowed to operate to disfranchise the voters.

PETITION for mandamus. The facts of the case are stated in the opinion of the Court.

W. C. GOUDY, and the Relator in person, for the Relator.

U. F. LINDER, and J. L. KING, for the Defendants.

BREESE, J. The petition in this case sets forth and shows that at an election held on the 4th day of November, 1862, for members of the General Assembly, and other officers in the county of Cook, the relator, with others, was a candidate for representative in the sixtieth representative district, and was eligible to the office; that, at the election, thirty-four hundred and twenty-nine votes were cast for the relator, thirty-four hundred and twelve votes were cast for George H. Gage, thirty-three hundred and eighty-five votes were cast for Michael Brand, and thirty-three hundred and seventy-seven votes for John Lyle King, as shown by the poll-books, and by the certificates returned by the judges and inspectors of the election to the office of the clerk of the County Court of Cook County, provided all the votes shown by the poll-books and certificates to have been cast for these candidates should be counted. It further shows, after all the returns from the different towns, precincts, and wards, in the county of Cook, had been received by the clerk, on the 8th day of November, 1862, the clerk, L. P. Hilliard, called to his assistance J. B. Bradwell and L. H. Davis, two justices of the peace of the county, and proceeded to open the returns and make abstracts of the votes cast for the different officers voted for at that election, and, in the performance of this duty, the clerk, with the assistance of these justices of the peace, opened the returns

of the second precinct of the fourth ward in the city of Chicago, a legally established voting precinct in the sixtieth representative district, which was found in all respects to be in compliance with the statute of this State, except that the affidavits of two of the judges, and of the two clerks who acted in the precinct and made the returns, and which were prefixed to the poll-books, did not have the signature of the officers who administered the oaths attached to the several jurats; that one of the judges, John Leib, had been duly sworn before the clerk of the County Court, and his affidavit was in all respects regular; that Leib appeared before the board of canvassers, and offered to prove that the other judges and the clerks had been duly sworn by him after he had been sworn, and before they entered on the performance of their duties, and asked leave to put his name to the jurats, but the majority of the board refused to allow the proof to be made, or to permit Leib to sign his name to the several jurats, and refused to count the votes so shown by the poll-books and returns to have been cast in that precinct, for the only reason that the several jurats did not have the signature of the officer who administered the oath to the judges and clerks.

It shows that the returns from this precinct foot up one hundred and eighty-one votes for relator, and the same number for Brand, and fifty-nine votes each for Gage and King, for representatives, and that the rejection of these votes will deprive the relator of a certificate of election, and award it to King. The relator states he was present before the board when these returns were canvassed, and insisted that the votes appearing therein as having been cast, should be counted and entered in the abstract, which was refused by the majority of the board. That if the votes of that precinct are received and counted, he will be entitled to a certificate of election, and he has demanded of the county clerk such certificate, which he refuses to grant, because of the rejection of these returns, and for no other reason, the effect of which will be to give to King a greater number of votes. The prayer of the petition is for an alternative writ of mandamus against the clerk and the two justices of the peace, to show cause why a peremptory

mandamus should not be awarded requiring them to count the votes cast in this precinct, and enter the votes so cast in the abstracts of votes, and against the clerk, requiring him to show cause why such writ should not issue to compel him to certify the election of the relator as a representative in the General Assembly for the sixtieth representative district.

To this alternative writ, the clerk, Hilliard, returns on oath that he did, as clerk of the County Court of Cook county, on the day stated in the petition, call to his assistance Bradwell and Davis, justices of the peace of Cook county, and proceeded to canvass the votes as stated in the petition, and made abstracts of the votes, as shown by the relator, except that the affidavit of Leib was not offered to the board until a majority of the board had decided to throw out this poll-book, and, having canvassed all the returns presented to the board, thereupon the board dissolved; and he further states, that, on the 10th day of November, John Lyle King demanded a certificate of his election, which, as clerk, he made out and signed, and affixed the seal of his office thereto, and delivered it to said King, it bearing date November 10th, 1862, which is the true date.

Davis, on his oath, states in his return that he was called on to aid in canvassing the votes as alleged in the petition; that he met with the clerk and Bradwell, and proceeded to canvass the returns; that when the pretended poll-book of the second precinct of the fourth ward was presented, Bradwell looked at it, examined it, and pronounced it irregular and informal, and suggested to affiant that it must be thrown out, to which affiant agreed, and, the clerk concurring, the board decided to throw out that poll-book and returns; that subsequently the attention of the board was called to this poll-book, and arguments of counsel heard for and against throwing out these returns, and the affidavit of Leib was offered to complete the returns, and upon due consideration, and the exercise of sound discretion, the majority of the board decided to throw out this poll-book and return, and proceeded to canvass the remainder of the returns and declare the result. That on Monday morning, the 10th, he called at the clerk's office, and

after examining the returns as made out by the board, he signed them, and thereupon the board was dissolved.

Bradwell, on oath, answers, admitting the statements in the petition to be true, and further says, that at the time of counting the votes he considered the action of the majority of the board of canvassers wrong, and entered his protest against it; that he was always willing to have these votes counted. He further states, that no certificate of election had issued to King until after the clerk was served with a notice by relator of this application for a writ of mandamus.

The exhibits attached to the petition show the oath taken by Leib, as one of the judges of the election, before the clerk of the County Court, which is in the form prescribed by the statute, and also the same form of oath alleged to have been taken by the other judges and clerks of the election, the jurats not being signed by the judge who administered the oath.

On the coming in of these returns, the defendants, Hilliard and Davis, entered their motion to quash the alternative writ of mandamus, for these reasons: First, Because the writ is returnable on the 14th of November, 1862, and the parties to be affected by it have not had ten days' notice previous thereto, and have not the opportunity on this writ of contesting the same for want of time; Second, Because the petition and writ do not show that the relator is entitled to the relief sought, and the matters contained in the writ are insufficient in law; Third, Because defendants are not required by law to reassemble and count the votes in question; Fourth, Because it does not appear that the relator has no other specific legal remedy; Fifth, For want of jurisdiction in this court, the House of Representatives alone having cognizance of the matter; Sixth, Because the return shows that the county clerk has, prior to the issuing of the writ, issued a certificate of election in conformity with the vote declared; and because the petition and writ are otherwise informal and defective.

Upon the first point, the statute regulating this writ (Scates' Comp. 223) does not require a notice of ten days, or any other specified number of days, but gives the court power to allow such convenient time to make return, plead, reply, rejoin, or

demur, as to the court shall seem just and reasonable. By rule thirty-seven of this court, ten days' previous notice of the application is requisite, unless the court, for special reasons, shall otherwise direct. The longest time was allowed in this case which could be given within the term of this court, though no special reasons were formally assigned for abridging the time. The fact that this court sits but a few days in the First Grand Division, is a sufficient reason for dispensing with the notice of ten days. The term does not usually consume one-half that time. A formal and full return having been made to the alternative writ, affords conclusive evidence that the time allowed was ample.

The second ground is, in effect, a demurrer to the petition. No causes of demurrer are set forth, and we cannot discover any. The alternative writ stands as a declaration in an ordinary action, and is sufficient if it contains all the facts necessary to call into action the power of this court. All material facts are fully set forth, so that they may be admitted or traversed. They are by the demurrer admitted to be true. The only question is, what is the law on the admitted facts?

The third ground may possibly be well taken, but constitutes no bar to the application. There is no necessity for reassembling the board of canvassers, for the return does not deny that the relator is entitled to the certificate if the votes of this precinct are counted. It is admitted they make up the majority of votes in favor of the relator, so that nothing remains but for the clerk to issue the certificate.

As to the fourth and fifth grounds of objection, the petition does not allege, in terms, that the relator has no other specific legal remedy, but, from the nature of the case, it is apparent he has none. He seeks to obtain the evidence of his election as a representative in the General Assembly—to obtain a specific thing which cannot be obtained through any other legal process. The House of Representatives cannot give it to him, though that body may oust him, even when possessed of the certificate, for causes *dehors.* His remedy does not lie in the power of the House in this respect. It is preliminary to an action of that body, and over which it has no power, or

control, or jurisdiction. It is a demand upon a ministerial officer to perform a duty, enjoined by law, for which all other legal process is wholly inadequate. The House of Representatives has no cognizance whatever of this matter. That body can only take cognizance of the case when the certificate is presented, and a seat claimed in virtue of it.

Upon the remaining ground of objection, that the county clerk had issued a certificate of election to another party, prior to the issuing out of this writ, it is only necessary to say that it is in proof the certificate was not issued until after .notice of this application for this writ. When the fact was brought home to the clerk that this application was made, it would have been quite decorous and proper to pause in his action, and await the decision of the court; the more especially as by issuing the certificate to a party not entitled, the right of the true claimant could not be weakened thereby. The power remains to the clerk to issue the certificate to the party this court may deem entitled to it. *The People, etc.* v. *Rives*, 27 Ill. 246. There are no other means known to the law by which this result can be obtained. Though the House of Representatives is the sole and exclusive judge of the qualifications of its members, this application has no reference whatever to the point of qualifications. Its sole purpose is to procure the requisite evidence, to present to that body, of a *prima facie* right to a seat in it, independent wholly of the question of qualification. It is clear, then, the appropriate remedy is not with the House of Representatives. The only remedy the relator has—the only means by which he can obtain evidence of the right claimed, is by this compulsory writ of mandamus. This is very clear. No other process or proceeding can give the specific relief in the premises.

But it is urged that, as the certificate has already issued, the office is filled, and therefore the only remedy is by a contest before the House. Some cases are referred to in support of this position, but it will be seen most of them were applications for a mandamus to admit to an office. This is not such a case. The relator asks not to be admitted to an office, but that evidence of his having been elected to an office shall be

furnished him. It is not to turn one man out and put the relator in office, that this proceeding is had. A mandamus will not lie for such purpose, and a decision in this case cannot affect the right of another claiming the office. That is for the House of Representatives to determine. *The People ex rel. Aikin et al.* v. *Matteson and Stame,* 17 Ill. 169. In the case of *The People ex rel. Brewster and Jones* v. *Kilduff,* 15 Ill. 493, this court said that mandamus was the proper remedy against an ex-mayor to obtain possession of the seal, books, etc., the property of the corporation, by his successor, and this without involving the inquiry into the right to the office. So in the case of *The People ex rel. Cummings* v. *Head,* 25 Ill. 325, it was held that a mandamus is an adequate remedy by which to compel an old clerk to deliver the insignia of office to the new, but not to try and determine the right of either party to a permanent enjoyment of the office.

In some of the States, this writ is not allowed for such purpose, but frequent resort has been had to it in this State, resulting in decisions quite uniform and harmonious, and which must be our guide in preference to the rulings of courts of other States, cited by the defendants. We have noticed the fact, that the certificate of election, issued by the clerk to King, under which it is claimed the office is filled, was, in fact, issued after notice of this application, and that when notice was served, the canvass had not actually been completed.

But it is urged by the defendants, that the board of canvassers had and exercised a judicial discretion in ruling out these returns; and having acted in good faith, they cannot be compelled to act against their deliberate judgment.

We have recognized a board of canvassers as ministerial, and not judicial officers. In the case of *Head,* 25 Ill. 325, it was there said, the duty of a board of canvassers is a mere mechanical or mathematical duty. They may probably judge whether the returns are in due form, but, after that, they can only compute the votes cast for the several candidates, and declare the result. This class of power is not generally understood to be judicial, but purely ministerial. In the case of *The People ex rel. Bristol* v. *Pemson, Judge, etc.,* 2 Scam.

People *ex rel.* Fuller *v.* Hilliard *et al.*

189, a mandamus was awarded to compel the judge to sign a bill of exceptions presented to him by the relator, though he had actually signed one bill, as appeared in the case. This court said that the act of signing and approving the bills, is in its nature ministerial, though a legal discretion is in some measure to be used in determining whether or not the bill should be signed. In the case of *The People ex rel. Chicago, Burlington and Quincy Railroad Co.* v. *Wilson*, 17 Ill. 123, which was an application to the defendant, as judge of the 13th judicial circuit, for the appointment of commissioners to appraise and condemn certain pieces of land for the use of a railway, and which he had refused to appoint, it was objected in this court that the judge was acting in a judicial capacity, and that, having refused the application, a mandamus would not lie to compel him to reverse his decision.

This court said : " We cannot, by mandamus, control the judicial action of any inferior tribunal. We can, in such a case, only set it in motion, and require it to act one way or the other, but without determining how it shall act. And so, too, when the inferior tribunal is vested with a discretion in the performance of a duty imposed by law. We can only compel the performance of the duty, without controlling that discretion, or saying how the duty shall be performed. Here the act to be performed by the circuit judge is strictly of a ministerial character."

In *Strong's Case*, 20 Pickering, 484, it is said : " We are aware that this is not a writ of right, but grantable at the discretion of the court, and will not be granted where there is any other adequate specific remedy. But we have no doubt that the present is a proper case for the exercise of our discretion, and that to refuse to grant the writ would be doing palpable injustice to the petitioner, and defeating the will of a majority of the voters of the county, clearly manifested by their votes, duly and legally evidenced before the proper tribunal. No other remedy can reach the evil."

These cases settle all the objections urged against the writ, and, by necessary implication, seem to determine that, where a party is entitled to a specific thing, and there is no other

specific remedy, by which the very right claimed can. be secured, he is entitled, *ex debito justitiæ,* to demand it by mandamus. Bacon's Abridg., vol. 5, p. 418, title Mandamus.

Now, as to the returns which were rejected by the board, were they in conformity to the statute? for on this hinges the whole controversy.

Section 23, of chap. 37, title "Elections," provides, "When the votes shall have been examined and counted, the clerks shall set down in their poll-box the name of every person voted for, written at full length, the office for which such person received such vote or votes, and the number he did receive, the number being expressed in words at full length; such entry to be made as circumstances will admit, in the following form." · (Scates' Comp. 468.)

Section 25, of the same act, provides, that on the seventh day after the close of the election, or sooner, if all the returns be received, the clerk of the County Court, taking to his assistance two justices of the peace of his county, shall proceed to open the said returns, and make abstracts of the votes, in the following manner, etc.; and it shall be the duty of the said clerk immediately to make out a certificate of election to each of the persons having the highest number of votes, for senator and representatives to the General Assembly, and to county officers respectively, and to deliver such certificate to the person entitled to it, on his making application for that purpose to the clerk at his office. (Id. 468.)

These officers are clothed with no discretionary power. They are to open "the said returns," and make abstracts of the votes as they appear in said returns, and the clerk is to deliver a certificate of election to each of the persons having the highest number of votes, as manifested by "the said returns." They are not allowed to reject any returns, or to decide upon their validity, if, on the face, they are made in compliance with the law, and in the form prescribed by the statute. If the returns show the whole number of votes given, the names of the persons voted for, and the number of votes given to each, they contain everything that is material, and, if duly authenticated, should be received as valid returns.

It is not denied these returns were duly authenticated, in the mode prescribed by section twenty-three, above quoted. No objection was made to the certificates of the judges and clerks. The board was bound to go by their certificates, and to declare the result, as shown by the certificates. *The People, etc.* v. *Kilduff*, 15 Ill. 492.

The objection that the entry of the oaths of the judges and clerks of the election was not prefixed to the poll-books, as required by section 13, of chap. 37, is of no force, for such entry forms no part of the certificate on which the board is to act. The certificate itself was formal and regular. But we think it was wholly immaterial, so far as the validity of the return was concerned, whether the officers of this election precinct were sworn or not. They were acting *colore officii* in the performance of appropriate acts, and are presumed to have been well appointed and qualified. In the case of *The People* v. *Cook*, 14 Barbour, 259, it was said, if inspectors of elections come into office by color of title, that is sufficient to constitute them officers *de facto ;* and if they are officers *de facto*, their omission to take the oath prescribed by the statute, will not invalidate an election held by them. This principle applies to all officers. This court has said, in the case of *The Town of Lewiston* v. *Proctor*, 23 Ill. 533, if a person act as justice of the peace or police magistrate, whether he was irregularly elected or for a proper period, cannot be inquired into, collaterally—his decisions, under color of office, will be enforced. To the same purport is the case of *Greenleaf* v. *Low*, 4 Denio, 168.

It is sufficient, then, for the purposes of this controversy, that the judges and clerks of this election precinct were acting under color of office, having been duly appointed. It is not denied that they were officers *de facto*, and their certificate of the returns of the votes given in the precinct, being complete and full, and in strict compliance with the statute, the board of canvassers had no right to reject it. In rejecting it, they assumed a power dangerous to the citizen, and fatal to the elective franchise. Whence did the board of canvassers derive the power to entertain and act on this objection ? It

does not go to the character of the certificate, or to the authentication of the returns—all these were formal and correct, and we have found no law, and recognize no principle, justifying their act.

But if it was an objection which the board could entertain, it was one which could be removed by a very simple act. The oaths of the judges and clerks were filled out as prescribed by the statute, and signed and sworn to by all of them, which is not denied. The only defect was, the officer who administered the oath to them, neglected to put his name to the several jurats, nor is this denied. And it further appears, that during the canvass by the board, and pending the consideration of this objection, the relator offered to remove the difficulty by an amendment in accordance with the fact, and for that purpose produced one of the judges of the election, Mr. Leib, who, the poll-book showed, had been duly sworn by the county clerk, and offered to prove by him, that he had administered the oath to the other judges and clerks, in the form required by the statute, and which it appeared by the poll-book they had severally signed. It was also proposed by the relator, that Leib should be permitted to perfect the entry of the oaths, by then signing the jurats, all of which was refused by the board.

We cannot but think this was a grievous error on the part of the board. It was at most but a formal defect, and such defects are always open to correction. In England, in the British House of Commons, it was decided that a mistake in the Christian name of a party returned as a member, and also a false return, might be amended even at the bar of the House (Hammond's Treatise on the Practice of Parliament, 25); and there also, where the law requires the clerks of elections to be sworn, it was held, if they were not sworn, the election was not void. Peckwill's Cases of Contested Elections in Parliament, 506. Here the poll-books contained true copies of the several affidavits or oaths taken by the officers of the election, and they were duly subscribed by them—the signature of the officer who administered the oath, was alone wanting to the jurats, and though he offered and desired to supply his own

omission, it was refused, and two hundred and forty citizens thereby disfranchised.

We cannot reconcile it to our ideas of right and justice, that the voters of an entire precinct in an important and populous ward of the city of Chicago, shall be disfranchised by the neglect of the officer, who administered the oath of office to the judges and clerks of the election, to certify the fact, nor can we reconcile, on any principle, the refusal of the board to permit the jurats to be perfected. The amendment, if allowed, deprived no one of any right; it altered nothing, and was in furtherance of justice.

The certificate and returns were full and complete. The oath was no part of either. The plain duty of the board was to make the abstract from the returns, and give the certificate to the person who appeared by the returns to have received the highest vote. The question in all such cases should be, whom did a majority of the qualified voters elect? Forms should be made subservient to this inquiry, and should not rule in opposition to substance.

A literal compliance with prescribed forms is not required in any case, if the spirit of the law is not violated; and in all cases the intentions of the voters, clearly ascertained, should govern. Here has been a strict compliance with form, and the dearest right of freemen has, notwithstanding, been stricken down, and the plain and manifest intention of more than two hundred voters frustrated.

There being, then, no other specific remedy in the case, a peremptory writ of mandamus will be awarded to L. P. Hilliard, clerk of the Cook County Court, commanding him to issue a certificate of election to the relator, as a representative to the General Assembly, duly elected from the sixtieth representative district, in that county.

*Mandamus awarded.*